The next case called for oral argument is Baca v. James. Counsel? Good morning. May it please the court? Counsel? My name is Ellen Burford. I represent the appellate, Matthew James, in this matter. The present issue before the court involves the custody, visitation, and child support determination regarding a minor child, I.J., who was born in the parties on June 16, 2013. The appellee filed a petition for temporary and permanent sole custody on October 9, 2014. A trial then commenced where testimony was entered in order pertaining to those issues where it made a determination finding sole custody in favor of Ms. Baca, the mother. It extremely limited the visitation that was allowed between the minor child and Mr. James, my client, and it awarded child support in such high amounts that it resulted in a windfall to Ms. Baca, all against the manifest weight of the evidence that was presented at trial. Those are the three issues that I'm bringing up and asking the court to examine. The first, looking at the limited visitation. Prior to, when the parties separated in 2014 and prior to the court's determination, the parties were able to work together cooperatively and work out a visitation schedule that worked very, very well for all parties. This did not change until the trial court's order of June 4, 2015, when the court entered an order that essentially allowed my client every other weekend and one night during the week. The trial court placed great emphasis on the fact that my client's schedule was, he works for ConocoPhillips and he works 12-hour shifts. The court called this an irregular schedule and found that it was unpredictable. When in fact, his schedule is actually laid out a year in advance and provides him much stability. And doesn't he also work his 12-hour night shift too? He does. Half the time? Yes. So he works every two weeks. He'll work one week on the days and then one week, I'm two weeks of nights. But this essentially allows him 50% of his time during the day where he's allowed to raise his child. This is time that Ms. Baca would rather have the child go to a babysitter or a child care provider rather than spend that time with Mr. James, where he could spend those daytime hours. And then also on the days that he is on the night. I have a problem. I don't understand this. What is he going to do for the nights? On a night shift, his parents live across the street. He does go on certainly less sleep during that time period. He will come off of the night shift. He gets up and the evidence, the testimony very strongly supports this. That he would wake up, he would fix breakfast for all the parties. While the parties were still living together, Ms. Baca would still be sleeping. He'd come home, fix breakfast, take care of the minor child, spend a little bit of time with the minor child, and then walk the child down to his parents' house, which was essentially catty corner, less than a block away. The child would stay there while Mr. James went home, slept for five hours. Admittedly, he went on less sleep. And he says that sometimes that was difficult, but that it was worth it for him and that he had no problems parenting his child as a result of that schedule. He would then wake up, walk down the two blocks, and play with the minor child until he then had to go back to the night shift. Many times he'd have dinner there with his parents. Sometimes he would take them home and fix dinner for them there. But the night shift, the fact that he was on a night shift, really did not impact his ability to spend that time with his child. Certainly those five hours is very different with a grandparent versus a babysitter when Mr. James, which is how Ms. Baca had it set up on days after they separated. So there was a lot of emphasis put on this schedule. But it's not, it's not, it was certainly portrayed in a negative light. But it wasn't a negative schedule. In fact, it allowed him much more time with the minor child than a traditional, I believe 7.30 to 8.00 at times by Ms. Baca that she held. Mr. James had more time during the week and during the daytime to spend that time. He has two or three days every single week during the weekday, Monday through Friday, that he can spend with that child and every other weekend. After you take away the every other weekend so that Ms. Baca spends her every other weekend, Mr. James works that time period. It really works to the benefit of the child. And there was no reason for the court to restrict it in the way that it did. Ms. Baca herself stated in testimony, neither party was looking to modify this arrangement. Ms. Baca states Matt has him on all his days off, on all full days off. He keeps him every night, every other weekend. So every day he was off, he has him. And that's your position for what you're proposing to keep doing. Yes, I just want to say I never wanted to take I.J.'s dad for him. She goes on to say that she wanted this schedule to continue because it gave I.J. access to both parents. The court, the parties were asking for custody. And that was so that this all falls under the old family law act, which there was a determination of custody. And so the parties were seeking custody so that they could make those legal decisions. But the parties were not arguing this allocation of parenting time when you look at the very clear testimony. In addition, the court interjected more of its own thoughts without any scrap of evidence in the sense that it awarded Christmas every single year to Ms. Baca. There is nowhere, nowhere in the record is there a trace of evidence, testimony, anything to support that mother should get the Christmas holiday every single year. There's an asterisk next to a position statement that was submitted on behalf of Ms. Baca at the close of trial that says father does not celebrate Christmas. There's nothing in the trial that says anything about father not celebrating Christmas. Was that challenged? I'm sorry? Was that challenged? No, because it wasn't submitted. I'm sorry. No, it was not challenged because it was not submitted at the close of evidence. It was submitted that the asterisk, mother asked for Christmas every year, father asked for Christmas every other year in alternating years. That was in position statements. Never was that brought up by anybody in the testimony. After the close of evidence, the court invited new position statements, modified position statements, or a proposed order. And Mr. James did not file a modified position statement. Ms. James did. And in her new position statement, there's an asterisk next to the Christmas holiday request that says father does not request, or father does not celebrate Christmas. Nowhere was there any evidence that was ever submitted regarding the Christmas holiday. There was, that was challenged in Apley's response that there was testimony, there was a very, very brief testimony that mother was Catholic and father was an atheist. But even the most religious of litigants would say that Christmas time is celebrated by both the religious culture and the secular culture. That's not in evidence, is it? Which part? But who celebrates Christmas? No, there's nothing in there, no evidence at all about who celebrates. But that's the position that Christmas, in the response, that was Apley's response, was that that was the reason that the court granted that visitation. So those are the two primary problems with the court's order regarding the visitation. It's first that Mr. James' schedule is actually quite beneficial, especially to a minor child who's not in school yet, to spend that day, that time with his dad when he can during the day, or his grandparents for the few hours that he's sleeping, or to the, and then also the Christmas holiday. Mr. James would like to spend his Christmas holiday at least every other year and share the child during this time. But the court's determination and the court's interjection of its own beliefs was certainly an abuse of discretion. It had to be against the manifest way of the evidence when there was no evidence at all regarding the Christmas holiday and the visitation schedule. The ultimate order that was rendered, and this goes into the second issue, awarding sole custody to Ms. Baca, the ultimate order that was entered by the trial court was almost an identical adoption of the position statement that was proposed by Ms. Baca. The court made miniscule changes to it. It did not rely upon the evidence. Some of the biggest issues that the court relied upon, according to its order, had to do with finding that Mr. James' schedule was again irregular. I've already covered that. That falls here as well. It did not take into account that Ms. Baca's schedule. Also, according to her testimony, which admittedly was not consistent, Ms. Baca throughout the trial, her testimony would change. At first it began, it's 7 to 3.30, very straight. Well, sometimes I go in later, then I have to stay later, and then somebody else has to pick up the child. This is the evidence, and it would change throughout the trial exactly when she had to go to work and when she had to get off. Now you're putting a lot of emphasis on irregular and regular. Yes. And I'm assuming that, what does that mean if, is it not irregular if he works sometimes days and sometimes nights? I suppose I would agree with that. Or is that regular? I believe that it is regular in the sense that it does not change for a whole year. So when would it be irregular? He doesn't have the ability, when the parties don't have the ability to say when they're coming into work and when they're not. So his schedule is set. He can look at his schedule a year in advance and say, so as of today, May 17th, he can look at what he's doing on November 1st and say, I work on this day. Okay, now let's stop there. So then it also says in that schedule that he cannot work overtime, but is he given overtime or not? I thought there was something in the brief. I misunderstood your question. Was there something in the brief about he might get overtime? Mr. James is offered overtime. He doesn't take the overtime when he is scheduled to be with the minor child. The briefs do address that he can occasionally be forced out for overtime. There's testimony and in the briefs we discussed that he's only been called out for that, forced overtime, I believe it was nine times in the brief. Okay, now how many times in did she work late? That testimony was never firmly established. It changed frequently when asked. It started off that prior to the separation of the parties, it ultimately, the end when we finally got to the bottom of it, prior to the separation of the parties, it was just kind of on an everyday thing. Whenever she got into work... Is this in the testimony? Yes, that it would change based upon, someday she would get up later, spend more time in the morning with the child, take the child to babysitter. But if she went in later, then ultimately she would have to, she was required to work later because she had to work her full shift. But it wasn't a set schedule. Now, after the parties did separate, then it was more, what came out at the end of the testimony was that it was more of a self-imposed strict schedule of 7 to 3.30. But there were still times when she would be coming into work late and then required to stay later in the evening. So the child would be left with a child care provider further into the evening. How late did the latest time go, do you know? I think she got off at 3.30 it said? Well, 3.30 was the set schedule. I would be hesitant to say... Is there any evidence? Yes, there's testimony that says the latest I picked him up was maybe, I don't want to misquote the testimony, but I believe it was maybe 6.30, which means she would have gotten off at approximately 5.30 as she worked in St. Louis and then drove home. Other issues that the court relied upon in its determination of granting sole custody to Ms. Baca had to do with some domestic violence that occurred in the home. There was exactly one incident of domestic violence that was brought up as a result of that incident. Both parties claimed the other party was the aggressor. It was an isolated event. The police were not called on behalf of either party and there was never any order of protection. There was something in there about the cell phone. What happened to her? Did she have a cell phone? She did. Did it disappear at that argument? Throughout the argument, at times she had the cell phone and at times she did not. At the end of the argument or whenever they were separated, where was the cell phone? I don't know the answer to that question. There's nothing in the record to show that. I believe at the very end of the testimony, Mr. James had the cell phone. But it disappeared. Is that not true? That is true. So she didn't have a cell phone after the argument? At the very end of the argument, no. And it was her cell phone? It was her cell phone. It was her cell phone. That's how I understand the testimony. What's the standard review in this case? It's abuse of discretion or against the manifest weight of the evidence. The other issue of domestic violence that was brought up... Thank you, Counsel.  Thank you, Your Honor. Counsel? May it please the Court, for the audio record, my name is Curtis Blood and I represent Geneva, Baca. All the issues today are custody issues and I'll take them in the order that the briefs present them, which is visitation, custody, and child support, subject to the direction of the Court, of course. First thing I'd like to get straight is it's not true, what's written in the briefs and what we heard today, that the parties agreed on visitational parenting time, as we're calling it under the new act. They didn't agree. It's not a case where they agreed and the judge did something else. That's not what happened. They had a disagreement. The parties disagreed. The Court went with the schedule that was in place because my client was making it be in place. Schedule that my client insisted on. Matthew didn't want that schedule. He wanted more parenting time than the judge found in our favor. Discretionary finding. And I don't just want to tell you that, I want to show it to you. In the brief, in Appellant's brief, on page 14, it says, Petitioner and Respondent, Matthew and Geneva, were both seeking the same visitation as was being employed at the time of trial and both testified it was in IJ's best interest. Then you skip one page forward, page 13. Well, that's enough. That's enough of that to make the point. I would like to go to the testimony. I would like to go to Matthew's testimony. Now this is cited in our brief at page 16, so you don't have to remember this, but he's asked, So you're now suggesting Geneva ought to have your son on all those days when you're working? Answer was yes the hard way. Question, do you understand that's the exact schedule we just gave to the judge, our position statement, that you had a chance to read? Answer, that is not. Question, can you cite a specific day off when you've been denied contact with IJ? Answer, every Tuesday day shift that I've worked, she has denied him to me that evening. And every Thursday day shift that I've worked, she's denied me those evenings. That's the dispute. That's the dispute. He's working two consecutive 12-hour shifts in two days. A 12-hour shift, and then the next day another 12-hour shift. He's getting off of work after a shift that ends at 530 at night, and he wants his child now on his way home. Or when he gets home, he wants the child now. When he's going to go home and he says, he says shift work sucks, you're tired all the time. Well, but he wants the child for that time. While he sleeps off a tough shift, difficult shift, he wants his child now. She says, no, no, this is, he's with me. We're fine. I'll bring him over the next morning. I'm going to stay off. Well, you can look at that either way, but it's a dispute. It's a dispute. And the court settled it. The court settled it by keeping the parenting time exactly the same as it had been before the trial. The court didn't go off on a wild hair and do something entirely different. The parties had this dispute. The court just settled it. It's discretionary. The Christmas, the Christmas question, that's not worth much. That's not worth much. But was it challenged? No, no. It's been tried in Mount Vernon. It should have been tried in Edwardsville, and here we are in Mount Vernon trying the Christmas case. I don't want to spend more than a few seconds on it. I'm just saying that I don't think that we ought to be reversing trial courts based on questions they weren't asked to answer. And it may be that if this is going to be taken up, it ought to be taken up back in Edwardsville. Enough said about that. Custody. The trial, the front center and a lot of the trial was about that so-called isolated incident of domestic violence. Well, it was the only one testified to, but it did happen. Yes, there was two versions. Obviously, the judge adopted one because he held it against Matthew in the order of appeal. Again, custody is so much about what you believe and what you see. And three days this was tried, and the parties, of course, were under stress. They testified at great length. And I'm suggesting that unless there's some reason for you to think that my client had one eye in the center of her forehead, that the judge in Edwardsville saw, saw these people. And this court's in a pretty poor place to change that. And I think that the trial court got a little bit of a flavor that Matthew was more interested in child support than anything else. He's kind of a financial savant. Money comes to him. He knows how to get money. And if there's one thing that he knows, it's that paying child support is expensive. And if you have primary custody, you don't pay child support. And I think that's very much what this case is about. The parties know it. The circuit court knew it. This is primarily about child support. And Matthew would like to have primary custody, park the child across the street with his parents, and not pay child support. It's just, I think the trial court got that very solidly. I'd like to talk about child support now, and then I will be done. First, the 20% in the statute, that's presumptively correct. The trial court's entitled to, at its discretion, to go below it, or above it. The trial court stayed with it. The insurance issues are at page 10 and 11 of the reply brief. Matthew admits that the retroactive insurance was taken care of by the trial court on the motion to reconsider, and that's out of the case. And admits that he didn't give the trial court the insurance figures to deduct the premiums on the health insurance for the child, to deduct from his income. I'm suggesting again that if the insurance issue is interesting to this court, that it still should be for the trial court first. The trial court should hear that argument first. It shouldn't be reversed by another argument that the trial court did not hear. The daycare issue, I don't understand why that's even here. Circuit court was never asked to do anything about the daycare that my client chose. Then we come to what I think are the two big hitters in child support, and that is income tax refund, income tax refund. The court ordered Matthew, if he got an income tax refund, to pay 20% as child support. Well, we've cited a couple of cases in our brief saying that that's discretionary, and that that's just one way to do it. That's one acceptable way to handle income tax refunds. Again, it's just discretion. And again, discretion means would any reasonable person do what the trial judge did? And certainly, not only would many reasonable person do that, but that's often done in these cases. The child tax exemption deduction, federal deduction for child, the trial court ordered that to alternate years. And Matthew appeals that. That is, in the first instance, the presumption is that that goes with the custodial penalty. Now Matthew says that he contributes more than 50% of the child's support, and therefore it's an abuse of discretion. But I don't think that's so clear. I don't think that's so clear at all. My client does, I mean, Matthew writes the check. My client takes care of food, housing, laundry, transportation, and she doesn't write checks for that stuff. She just doesn't. And what the court's alternating exemption implies is that the court thought it wasn't that far off of even. And on this record, and certainly on Appellant's brief, you can't tell any different. Again, again, the question is abuse of discretion. The question is would any reasonable person have done what the trial judge did? And we're saying nothing, nothing even remotely approaches that in this case. Some questions about was Christmas challenged? No. Justice Goldner, the Christmas issue was never challenged. Just here we are, first time. Justice Welch, you asked if there was anything in the record about Christmas, how it was celebrated, how they celebrated it. No, not at all, no. Christmas was never mentioned. I scanned the record, searched for Christmas, nothing. Searched for alias on that. She testified he was. Her overtime, pretty sketchy. She said she works a pretty steady schedule. How late did she get off at latest? I don't believe the record's going to tell us that. At the end of the argument, where was her cell phone? Ah, the record does tell us that. She testified he took it from her. She testified that when she asked for it back, he said he couldn't give it back, he destroyed it. She said she asked for the pieces, and he did not give those to her. She bought a new cell phone. That's what the record says. That's her testimony. The judge, by the way, did not ignore that my client worked overtime. Actually, the judge said that she occasionally works late. So, the point that it was ignored, it's just not true.  I've answered all the questions that I've heard, and again, we ask that the court affirm judgment. Thank you. Thank you, counsel. Thank you. Turning to some of the trial, well, first I'd like to address would any reasonable person have done what the trial court did? That's what counsel just stated. And as far as the visitation and denying the Christmas holiday, at least every other holiday, I think that that was entirely unreasonable. I don't think that another reasonable person would have done that without any supporting evidence behind it. It was against the manifest way to the evidence because there was no evidence anywhere. Was that brought up in any kind of a post-trial motion to the trial court? Well, the motion to reconsider, we filed a motion to reconsider counsel at that time. Was that in that motion? It was more of a blanket motion to reconsider the visitation schedule, the custody, and the entire June 4th order. So, it was included in that. It didn't say Christmas. It did not specifically say Christmas. No, it did not. Turning to the child support issues, the appellant does not disagree that it is a rebuttable presumption that 20% of his income go to supporting his child. However, when you're dealing with above average incomes, as in this case, the courts have found that it is an abusive discretion to award 20% of the income when that child does not need that amount of income to support his needs. Looking specifically at Ms. Baca's affidavit of assets and liabilities, she requires $3,329.94 for both Ms. Baca and the child. At the 20% alone, not with the additional tax refund and the daycare expenses, but with that alone, he's still paying nearly half of what is required to support his child. What percentage do you think he's paying? 20? He's paying 20% of the net income without the deduction of the health insurance for the current support. Were those figures ever given? I couldn't find it in the brief. The figures of the health insurance were not given at the trial court. They were not available at that time. So no, the new figures were not a part of the trial court record. So they weren't going to put a strong motion in. Exactly. At that time, he had not yet moved to add the child to his insurance, and so he didn't know what it would be. It ends up coming, I believe, to $138 and some change a month. But the trial court order also does not allow for the deduction of that, for it to be determined at this amount and the deduction to be made later to determine his net income. As far as the tax refund, absolutely. If an individual is overwithholding their paycheck, they're having too much money taken out of their paycheck to pay for their income taxes at the end of the year, certainly that's net income. Certainly, a portion of that, 20% of that, would go to a dependent child. But that's not the situation, and courts have reviewed, Illinois courts have reviewed this specific situation where Mr. James also has a business. And as part of his business, he deducts the correct amount of his child support each year. He deducts the correct, I'm sorry, not child support, of taxes each year. But his business is brand new, and he's received many losses, economic losses as a result of it, and he's being reimbursed for those. Those are deductions he's allowed to take. Those are not income. That is money that he has put forth. His business has had some substantial losses, and that's the refund that he's getting. That is not the definition of income. Council will have you, in their brief, they say that if Matthew can spend it, he should share it. Ms. Baca is not entitled to a portion of when his business is at a loss. So the tax refund is not, in this specific, in this case, as in others, it is not income that she should be giving a portion of, she should be receiving a portion of. As far as the tax-dependent exemption, it is assuming, alternating every other year, it is assuming that the parties roughly contribute to half of the child's expenses. But the evidence in the testimony shows that Mr. James is paying for more than half of not just the minor child's child, minor child support, but also of her support and for her bills. So it's not roughly half. He's paying for the child's, which he doesn't dispute that there's a problem paying for his child, but he's also paying a considerable amount towards her expenses. And that's the part that shows. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel, and we'll take this case under advisement. Thank you.